corporation and AOL. With the court's permission, I'd like to reserve five minutes, if I may. Sure. I know the court has read the briefs and is prepared, and I have a prepared presentation. But if you have specific questions, I'd like to handle those first.  I'm going to read the briefs. Were these online activities? Well, the term online activities is specifically defined in an exclusion to the policy. So to speak of online activities broadly would not be correct in the context of how it was applied to exclude coverage for the insurance here. There were five specific online activities, and those are e-mail services, instant messaging, the supplying of third-party content, and then finally, and this is the key phrase in this appeal, providing Internet access to third parties. The mistake that was made by Judge Ware, in his opinion, at least seemed pretty clear to me, is that when he excluded coverage for the insurance here, he actually gave independent meaning to the term online activities. Instead of looking at the particular five categories that were designated there, which are clearly stated that they are online activities, is defined as, and then it lists out five. According to Judge Ware's opinion, he actually took off on just the definition online activities, gave it independent significant, and then reading further through the opinion, he went and he confirmed his analysis by looking now at the last of those five listed online activities, the providing Internet access to third parties. He severed that up, he took the word Internet, he took the word access, he wound up defining just the word access, he glued it back together, and he came up with a definition that said, Internet access to him means the ability to make use of the Internet, which we say is incorrect. Internet access, we contend, is very common, unambiguous meaning, and that meaning is it's the ability to connect to the Internet, the initial hookup, nothing more. Now, I say it's a commonplace meaning. I've given the court a discussion of how that term is actually used in context in the Reno case from the United States Supreme Court, where Justice Stevens actually talks about access versus services in the context of that case, but I'll give you a more particular example of how common the phrase is and how Internet access is equated with connectivity, and my example is taken from the Ninth Circuit, and it's actually taken from today, and it's actually taken from the court's calendar, because when I got the court's calendar, it said at the bottom, helpfully, that wireless Internet connectivity is now available at James R. Browning U.S. Courthouse. When I came into court this morning and looked at the calendar, there was a different sign that was down there. It's posted right next to the calendar, and it says, and I'm quoting, wireless Internet access available in the attorney lounge, the courthouse cafe, and the library. Clearly, someone in the clerk's office, and I'm going to try and convince your honors today, is equating connectivity with Internet access as an unambiguous common meaning of the term, and as I say, I believe Judge Ware went off in the wrong direction by looking at the title of the exclusion and not the specifics of the five categories. What did the underlying complaints say that your client did? The underlying complaints, I think there were four of them, were filed in 2000, and they allege a variety of torts. The key words that triggered the coverage from our perspective, well, let me back up and tell you what Smart Download did. Smart Download, this product, was back in the stone age of the Internet when people had dial-up Internet access, they often had the problem that the connection would freeze where someone would lift the phone when something was downloading, and as a result, you had to start all over again. What the Smart Download product did was it allowed a user to resume a download if it became interrupted by reason of someone lifting the phone or it just freezing. It also had a second function, and this is what led to the lawsuits. Smart Download as a product, as a piece of software, had in it a utility that tracked users' Internet habits, what they were looking at, what they were browsing, and what was happening is when you installed Smart Download to help you download something off the Internet, it was sending back to Netscape information about where you had been on the Internet. The idea from Netscape's perspective was that they were going to gather or mine this information to generate advertising opportunities. Unsurprisingly, they got sued, and they got sued for invasion of privacy under the ECPA, the Electronic Communications Privacy Act, and the CFAA, which is the Computer Fraud and Abuse Act. But looking to the specifics of the complaint, and now translating it to the coverage that was triggered here for the personal injury offense, there were allegations throughout the complaint of electronic bugging, of spying, of electronic surveillance, and I can give you references in the record to where you'll find those each in the complaint. In order, putting the exclusion aside for the moment, in order to come within coverage, would the claims against AOL and Netscape have to fall within the made known clause? Yeah, absolutely. It's a two-step analysis. We prevailed in the first step in that analysis. The court found, in fact, that the complaints that had been tendered to the carrier satisfied the ensuring language, the making known to any person or organization. We should probably look at it, but make it known. The court does contemplate that the information would be made known to a third party? It doesn't say that, and that certainly is their argument, and I'm prepared to present here today that, in fact, there were four different ways that that information was made known to third parties. Let me quickly run through them, if I may. Judge Ware agreed with us that there had been a making known by virtue of the user's information from Netscape to AOL, a corporate disclosure from one party to the other. A second way Judge Ware found was that there was also a disclosure from the corporate level to its employees, Netscape and AOL's employees, as third parties. They had been exposed to the user's information. There are two other ways that we outline in the brief. Implicitly on the face of the complaint and the allegations that were set forth, in particular with respect to the ECPA claim, if you were looking and construing how the plaintiffs go about putting together their cause of action, they contend that there had been a disclosure pursuant to Section 2511C1, which says basically that there had been an intended, one of the triggers for liability, that there had been a disclosure to someone other than the party who had acquired the information. Finally, and I think this is critical, there were allegations in the underlying complaint that there had been a disclosure to a third-party advertising agency by the name of Adforce. We presented the declaration to Mr. Patrick Carome, who was the defense counsel for AOL and Netscape. Mr. Carome, without contradiction, testifies in his declaration that, in fact, the plaintiffs aggressively pursued a theory in the underlying case that, in fact, a disclosure had taken place to a third party. Now, the significance of that, whether it actually took place or not, actually is irrelevant here. The fact of the matter is that it had been alleged in the underlying case, and we're talking about the duty to defend in this instance. What happened with the underlying suits? The underlying cases were resolved successfully without any payment by AOL, actually. What they wound up with was a big, fat bill for defense costs, which is the subject of this suit. You've got a little over five minutes. You wanted five, you have five and a half. You know, you prepare a whole presentation and then you never get to it, but that's okay. Thank you for your argument. Do we have time for rebuttal? Thank you. We'll hear from St. Paul at this time. May it please the Court. Chuck Spivak, Your Honor, on behalf of St. Paul Mercury Insurance Company. Your Honor, here's the problem with Appellant's argument, and I think it was really aptly summed up by the little example they gave reading from the Court's dockets today, talking about how you can connect to the Internet in the courthouse today, very 21st century. The problem with the plaintiff's argument is that they take one portion of the accepted definition of access, entry, and then says any time anyone uses the word access, they must mean entry, ignoring the fact that the definition of access means more. Access includes not only the permission or ability to enter, but also the freedom or ability to make use of something. Thus, when you use the word providing Internet access, yes, you're talking about providing an Internet connection, but its plain meaning is not limited to that activity. AOL's argument in this case requires this Court to conclude that the only meaning of access is entry, connectivity, and to ignore the remainder of the common accepted definition of access, meaning once you get in, you have the ability to use. And this is where their argument fails, because they point to things like the docket talking about access. We don't dispute that part of the definition of access is entry. What we dispute is that you stop there. It's the difference, I take it your argument is, between getting that page that says I can't connect you and getting Yahoo or Google or whatever your home page is. That's exactly right, Your Honor. And what makes that important in this case is because if we define the term access using its entire definition, not just putting a period in the dictionary after the first phrase where there should be a comma and more follows. If we define it as it is defined in the dictionary, its plain, common, ordinary dictionary use, a California standard for interpretation of insurance policy language, then clearly what happened with smart download falls within the purview of this exclusion. The smart download according to the suits that were asserted against AOL, and all four of them are virtually identical. AOL's liability is based upon AOL's activities occurring online. The smart download secretly transmitted to AOL, information identifying the name, type, and source of each and every file that an Internet user downloads from any Internet site, along with information identifying that user. With the plaintiffs and all other class members being injured in exactly the same way, and this phrase exactly the same way is not my language, it's in the underlying complaints, by the intentional theft by AOL of their private information in violating federal law. Now this gets to the court's questions about whether there was actually a making known of material that violates a person's right to privacy. Counsel talks about how there were allegations in the complaint that there may have been hypothetical disclosure to a third party to add force. I'll get to this in more detail later, but while it's fresh, I want to make sure everyone understands all of that is irrelevant because the complaint doesn't base its claim for damages on the fact that there was a transmission of any information by AOL to the third party. The complaint, as we just said, says very simply that all the plaintiffs were injured in exactly the same way, by the intentional theft by AOL of their private information. In fact, with regard to motions to dismiss the underlying case, the plaintiffs themselves said, what you say, AOL, made of this stuff is irrelevant to our claim. Liability is established simply by the fact that they acquired it, and any erroneous, I don't mean to be erroneous, any allegations of hypothetical third party disclosure have nothing to do with the nature of the claim that was made. The policy only applies to the nature of the claim that was made. So the key word is access, and the key question is, what's the definition of access, and judge where got it exactly right? Access, as defined in the dictionary, means not just connection, the ability to enter, but then the ability to do something once you get in, the ability to use that access. And when defined in that manner, its plain, common, ordinary, and dictionary definition, what AOL was doing with Smart Download and the basis for the plaintiff's claim clearly falls within the scope of that exclusion. Now, what AOL then tries to do is to say, as I indicated, let's just stop the definition of access. Let's stop it because the dictionaries you look at, you shouldn't really be looking at those dictionaries, you should be looking at technical dictionaries. Well, first, this court very recently in the Northrop Grumman v. Factory Mutual decision reaffirmed the fact that you look at dictionaries to determine what the ordinary and popular sense of an insurance policy term is, and that dictionary definitions are an appropriate consideration in evaluating the ordinary meaning of terms in an insurance suit. Second, any attempt to limit the definition beyond the ordinary to a technical sense, saying that somehow because this has to do with the brave new world of the Internet, we don't use regular Merriam's or Webster's dictionaries, runs into the roadblock, as this court has determined and as the California appellate courts have determined, that we only look at a technical context if there is evidence in the record to determine that the parties intended to apply such a limitation, to not use the plain and ordinary use. And in this case, not only is there no evidence that the parties intended this, the record confirms that AOL intended this exclusion to be interpreted exactly the way we're arguing it to be interpreted now. The record in this case is simply astounding in terms of AOL's talking about what type of insurance it wanted from St. Paul. It did not want any advertising injury or personal injury coverage having to do with its online activities. It wanted to do that by purchasing separate professional media risk coverage. It wanted to limit the St. Paul coverage to traditional bricks-and-mortar insurance, providing coverage for the same types of risks that law firms or accounting firms face. Yet now they say that we should have a technical definition applied. You don't apply a technical definition unless the record supports that that was the party's intent, and not only does the record not support it, the record actually supports our position that this exclusion should be interpreted exactly the way we're saying it should. And there's a lot of this stuff in the record, but if you read only one thing in the record, I would ask that you read this. Mr. Spencer's AOL's own employees' June 23, 2000 email to Marsh, in which he sets forth what AOL's intention was in purchasing this insurance from St. Paul and in defining what the purpose of this exclusion was. And it says exactly what we're telling this Court. Do you have an ER site? I do, Your Honor. It's ER 1162. It's also at SER 82 through 85. Most important, Your Honors, as it turns out, the technical definition that AOL provides isn't really even applicable to the terms that are before this Court. Here, one of the cases we provided with our Rule 28J submission is very enlightening. It's the Hazleton v. Quicken Loans case, a 2008 case out of the Western District of Washington. What's important in that case is not its holding, but its recognition that as terms of art, Internet access service has a broader meaning than Internet service provider, and that while the latter, providing Internet service, can be limited to providing Internet connectivity to subscribers, Internet access service encompasses a wider range of activities, such as enabling access to content or information rather than just to the Internet itself. Is this in your brief? It's in our Rule 28J submission. Your Honor, now that case, the Quicken Loans case, cites the California authority to the same effect, Facebook v. ConnectU, Northern District of California, 489 FedSecond 1078. Thus, what AOL tries to do then, in light of this recognition, Internet access means something than Internet service, is to try to recast the term in the policy, not just to providing Internet access to third parties, but here's what they tell you. They say what this really means is providing a commercial connection to the Internet to third parties while acting as an Internet service provider. This is on page 28 of their opening brief. They do this to try to get the court to think that what we're really talking about here is providing services as an Internet service provider, NISP. But the actual term used is providing Internet access, and the courts recognize Internet access service has a much broader definition than Internet service provider. And nowhere in this disputed provision, providing Internet access to third parties, is the term Internet service provider used or is the term service even used? And note, with regard to four of the other entities or examples in which the exclusion will apply, AOL managed to use the word service in crafting and drafting this definition. But when it comes to talking about providing Internet access to third parties, they don't use the word service. They don't use ISP. They don't use Internet service provider. And the courts recognize that there's a difference between providing Internet access versus providing Internet service. So even if you were to apply their own technical definition, their own industry doesn't accept the argument that they're providing. It would if they had used the word ISP or Internet service provider, but they didn't do it. And so the only way they can make this argument is to craft that phrase onto the definition, as they did on page 28 of their opening brief. The problem is that language isn't there, and California rules of construction will not allow this court to add language to the decision that's not there. Now, again, the key to this entire argument with regard to the access of the exclusion is that AOL must establish that providing Internet access to third parties can only mean providing a connection to the Internet, that its plain, ordinary meaning is specifically limited just to that. But it can't do it, and Judge Ware was correct. It can't do it because the plain, ordinary dictionary definition of the term access is not limited to entry or connectivity. It also clearly means, once in, the ability to make use, and even the technical meaning of access. As used in the great world of the Internet does not support this contention, because as these cases cited in our Rule 28J's additional submissions point out, even in the industry there's a recognized difference between an Internet access service and an Internet service provider. If they wanted to limit it to activities of an ISP, they could have put that in the definition, but they didn't. Now, I'd like in my last couple minutes to address Your Honor's discussions concerning the entry question to this entire case, and that is whether the covered offense of making known to any person or organization written or spoken material that violates a person's right of privacy is even met. We don't even get to the exclusion if we don't get past the fact that this claim doesn't assert a covered cause of action. Now, the policy is very explicit. This is offense-based coverage. The law in California says that the claim must fit specifically within the covered offense. The policy covers injury that is caused by a personal injury offense. The personal injury offense here is making known to any person or organization written or spoken material that violates a person's right of privacy. You have the benefit of the fact that the California courts have clearly spoken on this specific language, exactly the same language, another St. Paul policy, another case that I argued at the California Court of Appeals. The California Court of Appeals in that ACS decision, in review of that decision was denied by the California Supreme Court and a remitter was issued, held that for coverage to exist under this offense, the liability of the insured must be predicated upon the insured making known secret information about the claimant to a third party. And that, undisputably, is not the case here. That's not the basis of the underlying four smart download class action cases. Do any of the class action complaints allege that AOL and Netscape exchanged information because of smart download between the two companies? Your Honor, the information became part of the corporate electronic ether within the companies and access or access, I shouldn't even use that word, that the ability to get that information was available, the people having access to the database. In other words, they couldn't just get into the database, they could use it and find it if they wanted to. So I guess I am using the word access in the same corporate and the same common usage. But just because there were separate divisions within the company that could gain access to the data, not just entry to the database, but access to the data itself, doesn't necessarily correslate to the concept that it was published or made known. It was available. I do not have been clear in my question. In referring to the SPECT, I hope I pronounced it right, S-P-E-C-H-T complaint? Yes. My understanding was that it simply alleged that Netscape and AOL used this program to gain information and it says nothing about them exchanging the information between them. Yes, I agree with that, Your Honor. And it also says nothing about them exchanging the information with their own employees. I agree with that too, Your Honor. And in fact, Your Honor, AOL made a motion to dismiss the SPECT complaint and others claiming there's no allegation here that we made any improper use of this information, that we sold it to anyone, that we shared it to anyone. And the plaintiffs came back and said, well, so what? That's not the basis of what our cause of action is. Our basic cause of action has nothing to do with you sharing it with anyone, disclosing it to anyone, giving it to anyone. Our cause of action is based simply on the fact that you acquired it. In fact, they were more stern than that, that you stole it. Not just acquired it, but you stole it. Now, theft is not a plain, ordinary, and common definition of the phrase making known. As we indicated in our briefs, you don't go into the store and shoplift a newspaper and walk out and say I made known a newspaper. You stole it. And that's what the allegations are. Okay. Thank you, Your Honor. Thank you for your argument. Thanks for coming in today. You have a little time for rebuttal. Thank you. So under your definition of Internet access, if I go to a hotel and they say we have free Internet access for our guests and I plug the Ethernet cord into the back of my laptop and try to get in and I get that this page cannot be displayed, have they provided me Internet access? They have not. I have to actually connect. I have to see, in my case, Yahoo. You're calling down to the front desk saying I did not get what you promised to me. I do not have the ability to make a connection. That's the problem here. Isn't that a problem for your client? Why isn't it a problem? Because the meaning of Internet access, we contend, is and only is that connection, which raises a significant point here. So by your definition, the front desk should say, hey, we gave you connectivity. No, they didn't. We said nothing about you getting on the Internet and actually being able to use Yahoo, Google, whatever. Yes, the ability, in your exchange with the hotel desk, you would be speaking correctly if you said I did not receive Internet access. The fact that they provided you a cord is not the access. It's the connection itself. You have to look at this language in context. AOL is an Internet service provider. When you click on that icon, it is connecting up your computer to the Internet. That's what you're paying for is that connection. Mr. Spivak says, well, there are other definitions of Internet access, but he misses the essential point that this is a definition that's in an insurance policy, and moreover, it's in an exclusion. And you're talking about the insured trying to get, having satisfied already the insuring clause, the standard, the evidentiary standard, the burden of proof and persuasion at this point on an exclusion, is that it must be narrowly construed. So Mr. Spivak, going on and on in his world of endless possibilities, isn't looking at the reality of this case, which is an exclusion. You want to respond to his arguments on made known? Yes, very specifically. First of all, I know Your Honor has had a question about, look, what's in that complaint? What's in that spec complaint? I'm very interested in what was alleged there. And Mr. Spivak says, oh, it's theft. You'd go so far as to say it's stealing. That's alleged. That's definitely in there. But let me give you some other choice words that are in there that make up privacy violations. For example, the term eavesdropping. That's at 214, paragraph 38 of the complaint. Electronic bugging, 214, paragraph 13 of the complaint. Spying on Internet activities, 204, paragraph 2. Also, 213, paragraph 37. Continuing surveillance of electronic communications, 204, paragraph 2. And then finally, all of this taking place in the context of the Electronic Communications Privacy Act. There's a privacy violation that's going on here. We satisfied the privacy violation. As far as, gee, was it disclosed to someone? The answer, I've already addressed, there was the intercorporate disclosures. But let's talk the particulars and the dynamics of the underlying case. We have a declaration, undisputed here, from Mr. Patrick Carone, who was the defense counsel, who says, this is at the record, 187 and 188, paragraphs 5, paragraph 6, and paragraph 7. He says, as I was defending this case, the plaintiffs were aggressively pursuing the theory that we had disclosed this information that had been wrongfully acquired through smart download to third parties. In particular, an ad agency by the name of AdForce. Whether it took place or not, let me say again, is irrelevant. It had been alleged, and for duty to defend analysis, it was enough that that allegation was made that we're entitled to the coverage. One final point. We're talking, again, about an exclusion in the policy. I'm going to make two points quickly. An exclusion in the policy, and it's one of the points that's just gone out of my head. Let's talk about the other. It'll occur to you. It was going to be brilliant, too. The making known point, all of the case law that's been presented by St. Paul is distinguishable. All of it. They're all TCPA cases. They're all fax blasting cases. That's not what we have here. In fact, those TCPA fax blasting cases say, hey, this language applies to secrecy violation cases, and they admit that this is a secrecy violation. Those cases are all distinguishable. I'm not going to figure out what my ‑‑ oh, my exclusion point. Thankfully, it came back to me, and it's simply this. The case law in our brief, two cases that we present, both shade and low, say, look, there has to be a nexus, a connection, for lack of a better term, between the offense that you're seeking coverage with for and the terms of the underlying exclusion. And what we have in the spec complaint is not the claimants there saying we didn't get an Internet connection. They're not complaining about that. They're not complaining that they didn't have the ability to download or access the Internet. They say our complaint is you were spying on us. So if you're going to use language that says providing Internet access, that's the basis for the exclusion. You should actually have an exclusion that says we don't cover privacy. And that's not what it says. And I'm out of time. Okay. Thank you both for your arguments. Very interesting case that will be submitted for decision.
judges: Hug, Fletcher B. , Hawkins